359 F.2d 624
 123 U.S.App.D.C. 310
 AMERICAN AIRLINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent, The Slick Corporation,
Air FreightForwarders Association, the Flying
Tiger Line, Inc., Intervenors.
TRANS WORLD AIRLINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent, The Slick Corporation,
Air FreightForwarders Association, the Flying
Tiger Line, Inc., Intervenors.
UNITED AIR LINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent, The Slick Corporation,
Air FreightForwarders Association, the Flying
Tiger Line, Inc., Intervenors.
 Nos. 18833, 18834, 18840.
 United States Court of Appeals District of Columbia Circuit.
 Argued June 16, 1965.
Decided March 2, 1966.
 
 Mr. Alfred V. J. Prather, Washington, D.C., for petitioner in No. 18833. Mr. Gerry Levenberg, Washington, D.C., also entered an appearance.
 Mr. Warren E. Baker, Washington, D.C., with whom Mr. Joseph M. Paul, Jr., Washington, D.C., was on the brief, for petitioner in No. 18834.
 Mr. O. D. Ozment, Associate Gen. Counsel, Litigation and Legislation, C.A.B., with whom Asst. Atty. Gen. William H. Orrick, Jr., Messrs. John H. Wanner, Gen. Counsel, Joseph B. Goldman, Deputy Gen. Counsel. C.A.B., and Lionel Kestenbaum, Atty., Dept. of Justice, were on the brief, for respondent.
 
 
 1
 Mr. Richard. P. Taylor, Washington, D.C., with whom Mr. William E. Miller, Washington, D.C., was on the brief, for intervenor Slick Corp.
 
 
 2
 Messrs. Robert L. Stern, Chicago, Ill., and J. Francis Reilly, Washington, D.C., were on the brief for petitioner in No. 18840.
 
 
 3
 Mr. Louis P. Haffer, Washington, D.C., was on the brief for intervenor Air Freight Forwarders Ass'n.
 
 
 4
 Messrs. B. Howell Hill and Frank H. Strickler, Washington, D.C., were on the brief for Braniff Airways as amicus curiae.
 
 
 5
 Messrs. R. S. Maurer and James W. Callison, Atlanta, Ga., were on the brief for Delta Airlines, Inc., as amicus curiae. Mr. Robert Reed Gray, Washington, D.C., also entered an appearance.
 
 
 6
 Messrs. Herman F. Scheurer, Jr., and C. Edward Lwasure, Washington, D.C., were on the brief for Continental Airlines, Inc., as amicus curiae.
 
 
 7
 Mr. Lipman Redman, Washington, D.C., was on the brief for Airlift International, Inc., as amicus curiae.
 
 
 8
 Mr. Edwin Jason Dryer, Washington, D.C., entered an appearance for intervenor, Flying Tiger Line, Inc.
 
 
 9
 Before BAZELON, Chief Judge, FAHY, WASHINGTON,* DANAHER, BURGER, WRIGHT, MCGOWAN, TAMM and LEVENTHAL, Circuit Judges, sitting en banc.
 
 LEVENTHAL, Circuit Judge:
 
 10
 On August 7, 1964, the Civil Aeronautics Board,[1] two members dissenting, issued a 'policy statement' regulation (PS-24), providing that only allcargo carriers may provide 'blocked space service'-- essentially the sale of space on flights at wholesale rates, when 'blocked' or reserved by the user on an agreement to use a specified amount of space.[2] Concomitantly, the Board vacated its suspension of a tariff proposing such blocked space service filed by Slick Airways, one of the all-cargo carriers.[3] Defensive tariffs, similar to but not identical with Slick's were filed by American Airlines, Trans-World Airlines and United Airlines,[4] petitioners here, who are combination carriers, i.e. carriers authorized to carry persons as well as property and mail.[5] These tariffs were summarily rejected in Order No. E-21170, August 11, 1964, brought before this court on petitions for review.
 
 
 11
 The CAB's regulation was the culmination of a rule making proceeding (Docket 14148), held pursuant to notice of January 23, 1964, and supplemental notice of June 22, 1964. All interested parties had opportunity, of which petitioners availed themselves, to present their positions to the Board through oral arguments as well as written data, views, and rebuttals. The procedure followed by the Board admittedly complies fully with the requirements for rule making established in section 4 of the Administrative Procedure Act, 5 U.S.C. 1003. The question before us is whether this regulation effected a modification of petitioners' existing certificates which, under 401(g) of the Federal Aviation Act, 149 U.S.C. 1371(g), may be accomplished only after a full adjudicatory hearing. We hold that the regulation was validly issued.
 
 
 12
 The Board's policy statements in Regulation PS-24, essentially legislative findings and conclusions in support of its decision,[6] may be summarized as follows: There is a distinction between combination carriers and all-cargo carriers inherent in their certificates and operating responsibilities thereunder. The reservation of blocked space to all-cargo carriers will further their role as specialists for large volume air freight service in all-cargo aircraft. This can be expected to be followed by a shift of small volume shipments to the combination carriers, whose cargo operations supplement their passenger services and who are better suited for meeting the needs of this category of traffic, at less cost. The blocked space traffic, consisting of traffic produced by frequent, regular and high volume shippers, has particular need for a specialized type of service marked, among other things, by low rates, appropriately convenient schedules and assurance that space will be available when needed. A large market of traffic now moved on surface carriers will become available if air carriers achieve a breakthrough in properly servicing such traffic-- a breakthrough dependent on development of marketing and performance techniques adapted to serving the peculiar needs of these shippers, and dependent on attraction of high volume of traffic through rate reduction, in turn made possible by improved planning and efficiency.
 
 
 13
 The Board considered that its statutory responsibility to promote air transportation required it to pursue earliest possible achievement of the breakthrough, and that this depended on assigning the exclusive role of perfecting blocked space service to the specialized all-cargo carriers.
 
 
 14
 Of particular interest and significance were the following findings and conclusions:
 
 
 15
 However, the needed improvement in equipment utilization and load factors cannot be obtained if the traffic from blocked space arrangements is spread too thinly among carriers. Thus, if the blocked space concept is to be given a true test, we must make sure that excessive blocked space capacity is not offered. For this reason in particular, our policy contemplates that only the all-cargo carriers will be permitted to offer blocked space service at this time.
 
 
 16
 Assigning the all-cargo carriers the exclusive role of performing blocked-space service will, we believe, provide them with a needed source of financial strengthening. We recognize, of course, that some traffic now moving on the cargo services of the combination carriers may be diverted to the blocked space services of the all-cargo carriers, but we do not believe that such diversion would be significant. Moreover, these carriers can be expected to acquire an increasing share of small package shipments. Some traffic now moving on the all-cargo carriers at regular rates will be diverted to their lower blocked space rates. However, there is no reason to believe that attractive blocked space rates and the benefits of specialization will not ultimately bring about an increase in traffic more than offsetting any such diversion.
 
 
 17
 1. Petitioners say that the Board has no power by summary action, without hearing, to prevent a carrier or group of carriers from competing fully with other carriers. Their reliance on a 'fundamental principle' that carriers should be able to compete with each other, though couched here in procedural terms, has overtones of an argument on the merits. At the outset we reject the sweeping argument, if that argument is being made or implied, that such agency action would be invalid even if taken after the most elaborate of procedures. That competitors in a regulated industry should be treated similarly in rate rulings in order to preserve competition is not denied. But that is not to say that reasonable distinctions between groups of competitors are impermissible, and that different services and rates may not then be authorized for the different groups or classes. Congress made a broad delegation of power to the Board, in 416(a) of the Act (49 U.S.C. 1386(a)), to 'establish such just and reasonable classifications or groups of air carriers * * * as the nature of the services performed by such air carriers shall require.'
 
 
 18
 Petitioners have made no presentation that the Board's distinction between combination carriers and all-cargo carriers is meaningless or without rational foundation. Congress has given the Board not only a wide regulatory authority, but a specific promotional function to initiate proposals for the purpose of expanding efficient civil aviation transport;[7] the power to classify carriers and service; and the power to issue implementing rules and regulations.[8] This combination of powers, together with the underlying findings and conclusions, suffices to sustain the regulation on the merits, assuming no procedural bar. See generally United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943).
 
 
 19
 2. Petitioners claim that 401(g) of the Federal Aviation Act, 49 U.S.C. 1371(g), assures them an 'adjudicatory hearing' because the Board action amounts to a modification or suspension of existing rights under their certificates of public convenience and necessity.
 
 
 20
 In essence, petitioners' argument is the same as the thesis this court accepted ten years ago in the Storer case,[9] only to be reversed by the Supreme Court.[10] This court held the multiple ownership rule of the Federal Communications Commission invalid because of the inadequacy of the rule making procedure followed in its adoption, an adjudicatory hearing being expressly guaranteed by statute to applicants for licenses. The Supreme Court, however, held that notwithstanding the statutory hearing requirement the Commission retained the power to promulgate rules of general application consistent with the Act, and to deny an adjudicatory hearing to applicants whose applications on their face showed violations of the rule. Storer's vitality is attested by its recent application in FPC v. Texaco, 377 U.S. 33, 39, 84 S.Ct. 1105, 1109, 12 L.Ed.2d 112 (1964),[11] where the Supreme Court stated:
 
 
 21
 The statutory requirement for a hearing under 7 does not preclude the Commission from particularizing statutory standards through the rule-making process and barring at the threshold those who neither measure up to them nor show reasons why in the public interest the rule should be waived.
 
 
 22
 Petitioners argue that the Storer doctrine is restricted to regulations affecting future applications for new licenses or certificates, whereas here the CAB regulation affected rights under existing certificates. That such a restrictive reading of the Storer doctrine is unwarranted, is shown by such decisions as National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943);[12] Air Line Pilots Ass'n Intern. v. Quesada, 276 F.2d 892 (2d Cir. 1960);[13] and Capitol Airways, Inc. v. CAB, 110 U.S.App.D.C. 262, 292 F.2d 755 (1961).[14] See also Transcontinental Television Corp. v. FCC, 113 U.S. App.D.C. 384 F.2d 339 (1962).
 
 
 23
 The present case is different in particular aspects of the facts or statutory provisions from Storer and the other Storer doctrine cases. However, the Storer doctrine is not to be revised or reshaped by reference to fortuitous circumstances. It rests on a fundamental awareness that rule making is a vital part of the administrative process, particularly adapted to and needful for sound evolution of policy in guiding the future development of industries subject to intensive administrative regulation in the public interest, and that such rule making is not to be shackled, in the absence of clear and specific Congressional requirement, by importation of formalities developed for the adjudicatory process and basically unsuited for policy rule making.
 
 
 24
 3. The need for and importance of policy rule making made on the basis of a procedure appropriate thereto is clearly indentified in the Administrative Procedure Act (APA), 5 U.S.C. 1001 et seq. In general, the APA establishes a dichotomy between rule-making and adjudication. For adjudication a formal system in provided.[15]
 
 
 25
 Rule making, however, is governed by 4, which essentially requires only publication of notice of the subject or issues involved, an opportunity for interested persons to participate through submission of written data, and the right of petition in respect of rules. These more limited requirements are geared to the purpose of the rule making proceeding, which is typically concerned with broad policy considerations rather than review of individual conduct. Compare the Attorney General's Manual on the Administrative Procedure Act (1947), pp. 14-15:
 
 
 26
 The object of the rule making proceeding is the implementation or prescription of law or policy for the future, rather than the evaluation of a respondent's past conduct. Typically, the issues relate not to the evidentiary facts, as to which the veracity and demeanor of witnesses would often be important, but rather to the policy-making conclusions to be drawn from the facts. Senate Hearings (1941) pp. 657, 1298, 1451. Conversely, adjudication is concerned with the determination of past and present rights and liabilities. Normally, there is involved a decision as to whether past conduct was unlawful, so that the proceeding is characterized by an accusatory flavor and may result in disciplinary action. Not only were the draftsmen and proponents of the bill aware of this realistic distinction between rule making and adjudication, but they shaped the entire Act around it.
 
 
 27
 Rule making has a unique value and importance as an administrative technique for evolution of general policy, notwithstanding, or perhaps indeed because of, the freedom from the procedures carefully prescribed to assure fairness in individual adjudication. SEC v. Chenery Corp., 332 U.S. 194, 202, 203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).[16]
 
 
 28
 The regulation under discussion, being an 'agency statement of general * * * applicability and future effect designed to implement * * * or prescribe law or policy,' plainly satisfies the definition of 'rule' in 2(c) of the APA,[17] as well as general understanding. There is therefore a presumptive procedural validity for the rule making procedure prescribed in 4 of the APA, unless countermanded by a different Congressional mandate.
 
 
 29
 4. Serious questions have been raised concerning the adjudicatory-type hearings required and held on initial licensing involving specific carriers and routes. It has been suggested that air line certificates are an instance where 'functions that are more truly planning than adjudicatory have been forced too rigidly into the latter mould,' and that officials engaged in planning functions should be 'free to use flexible procedures in the search for ideas and policies' rather than be 'bound either as a matter of routine or law to pursue procedures ill-adapted for the performance of such a function.'[18]
 
 
 30
 The difficulties currently experienced in the administrative process, sometimes referred to as its 'malaise,' obviously do not warrant departure from procedures mandated by Congress. But they suggest the need for relative certitude before a court concludes that adjudicatory procedures are required. The need for certitude is underscored if the adjudicatory procedure is to be required on the ground that the proceeding involves an amendment of licensing, for under the Administrative Procedure Act that conclusion results in even more rigorous procedural requirements than apply to initial licensing. Thus, the examiner would not even be free to consult with agency technicians, as he is on initial licenses. And the presentation to the agency heads would have to await an examiner's report and proceed on the basis of exceptions thereto, whereas in initial licensing the agency may omit the examiner's report and proceed on the premise that exceptions can be more clearly focused in the light of proposals and views of the senior staff officials. In short, the rigors of the adjudicatory procedure could not even be softened by the exceptions deliberately provided by Congress in the APA in cases of initial licensing (and rule making on the record) in order to provide the flexibility requisite for proceedings principally involving policy determinations.[19]
 
 
 31
 5. We are not here concerned with a proceeding that in form is couched as rule making, general in scope and prospective in operation, but in substance and effect is individual in impact and condemnatory in purpose. The proceeding before us is rule making both in form and effect. There is no individual action here masquerading as a general rule. We have no basis for supposing that the Board's regulation was based on a sham rather than a genuine classification. The classes of carriers were analyzed both functionally and in terms of capacity for furthering the promotional purposes of the Act. The class of combination carriers is not accorded the same rights as the class of all-cargo carriers, but the difference is in no sense a punishment for sins of commission or omission. They are not, in Judge Washington's phrase, 'goats' being separated from favored sheep.[20]
 
 
 32
 6. Petitioners' contention is not advanced by CAB v. Delta Airlines, 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869 (1961). Once the Supreme Court made clear that the original certificate order had become final, it was undisputed that the second order, addressed to the one carrier (Delta) and prescribing for it a less favorable route than the original order, was an amendment of a certificate for which an adjudicatory hearing is requisite under 401(g) of the Federal Aviation Act. The 'security of route' principle thus gives protection to an individual carrier that has made an investment in order to carry on the certificated service, assuring it that the CAB will not worsen its position by action addressed against it individually, by prescribing inferior routes. Since the Supreme Court gave no indication in Delta that it intended to depart from the Storer Doctrine, we see no basis for reading Delta as implying that the mere fact that licenses will be affected renders general rule making an impermissible means of agency action governing all carriers, or an appropriate general class of carriers.
 
 
 33
 Where the agency is considering an order against a particular carrier or carriers there is protection through the requirement of the adjudicatory procedure appropriate for such individual actions and amendments, a requirement which Delta warns will be strictly enforced. Where the agency is considering a general regulation, applicable to all carriers, or to all carriers within an appropriate class, then each carrier is protected by the fact that it cannot be disadvantaged except as the Board takes action against an entire class. For any such class regulation there is also protection outside the field of procedure in that the general regulation must be reasonable both as to the classification employed, and as to the nature and extent of the restriction in relation to the evil remedied or other general public purpose furthered.
 
 
 34
 7. There may be wisdom in providing for oral testimony, at least in legislative-type hearings, in advance of the adoption of controversial regulations governing competitive practices, even though the need for development of overall requirements precluded Congressional requirement of such hearings for rule making generally.[21]
 
 
 35
 This court has indicated its readiness to lay down procedural requirements deemed inherent in the very concept of fair hearing for certain classes of cases, even though no such requirements had been specified by Congress. Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 334 F.2d 570 (1964); Pollack v. Simonson, 121 U.S.App.D.C. 632, 350 F.2d 740 (1965).[22]
 
 
 36
 However in the present case the CAB did not limit itself to minimum procedures, but rather gave the parties a significantly greater opportunity to persuade and enlighten the Board. It provided not merely for written comment, but in addition for oral argument.[23] The CAB, presumably with the aid of its policy staff, sifted out the dross and delineated key questions on which argument could most helpfully be focused, including the question material to the case at bar.
 
 
 37
 If additional procedural safeguards are to be imposed as a requirement it would be more salutary to incorporate them into a rule making procedure than to adopt a blanket requirement of an adjudicatory procedure. A rule making setting would better permit confinement of oral hearings to the kind of factual issues which can best be determined in the light of oral hearings, without undue elongation of the proceeding or sacrifice of the expedition and flexibility available in rule making. It would also permit the hearing examiner to confer with experts and the Board concerning 'legislative facts' and policy questions.
 
 
 38
 However, there is no basis on the present record for concluding that additional procedures were requisite for fair hearing. We might view the case differently if we were not confronted solely with a broad conceptual demand for an adjudicatory-type proceeding, which is at least consistent with, though we do not say it is attributable to, a desire for protracted delay. Nowhere in the record is there any specific proffer by petitioners as to the subjects they believed required oral hearings, what kind of facts they proposed to adduce, and by what witnesses, etc. Nor was there any specific proffer as to particular lines of cross-examination which required exploration at an oral hearing.[24]
 
 
 39
 The particular point most controverted by petitioners is the effect of the CAB regulation on their business. The issue involves what Professor Davis calls 'legislative' rather than 'adjudicative' facts.[25] It is the kind of issue involving expert opinions and forecasts, which cannot be decisively resolved by testimony. It is the kind of issue where a month of experience will be worth a year of hearings.
 
 
 40
 It is part of the genius of the administrative process that its flexibility permits adoption of approaches subject to expeditious adjustment in the light of experience. Although the CAB's regulation is not temporary in the sense of being expressly limited in duration, the Board's findings plainly reflect its assumption that the regulation was intended to be subject to re-examination.[26] The Board's regulations provide that 'any policy may be amended from time to time as experience or changing conditions may require.' 14 C.F.R. 399.4. In any event, it is the obligation of an agency to make re-examinations and adjustments in the light of experience.[27]
 
 
 41
 To avoid any possible misapprehension, our affirmance of the Board's action is without prejudice to the right of the combination carriers to reopen the question of their exclusion upon a showing that the Board's assumptions could not reasonably continue to be maintained in the light of actual experience, that their overall cargo business was significantly impaired, or that the air freight market had sufficiently expanded so that the promotion of the air cargo industry through blocked space reduced rates would not be imperiled by their participation.
 
 
 42
 Since our records show that this Court took action more than a year ago to permit the regulation to become effective (see note 3 supra), it should perhaps be mentioned that at the argument respondents stated that thus far there had been little blocked space traffic and no significant diversion from petitioners. Petitioners replied that this period has not been a fair test, since the all-cargo carriers may have been awaiting the outcome of the litigation before aggressively exploiting their newly won privileges. It suffices to say that if and when petitioners have a showing to make based in significant measure on actual relevant experience, they will have a remedy available to vindicate their asserted rights, both before the Board and on 'regulation' allowing all-cargo carriers-- but no others-- to offer reduced rates
 
 
 43
 Meanwhile they have been accorded a excluded combination airlines the minimum required for rule making. They have not been subject to a denial of procedural rights that undermines the validity of the regulation.
 
 
 44
 Affirmed.
 
 
 45
 WASHINGTON, Senior Circuit Judge, did not participate in this decision.
 
 
 46
 BURGER, Circuit Judge, with whom DANAHER and TAMM, Circuit Judges, join (dissenting):
 
 
 47
 Petitioners, three airlines authorized to carry both passengers and cargo on a regular basis, hold certificates for cargo carriage legally identical with the certificate held by Intervenor, Slick Corporation, an all-cargo carrier. Without holding the adjudicatory hearing required by statute before an outstanding certificate may be amended,[1] the Civil Aeronautics Board laid down what it described as a 'regulation' allowing all-cargo carriers -- but no otehrs-- to offer reduced rates for 'blocked-space' shipments; it expressly excluded -ombination airlines such as Petitioners from the benefits of offering the same reduced-rate service.
 
 
 48
 Acting under this 'regulation' the Board issued the order under review, specifically denying applications of Petitioners to offer the same service Slick had been authorized to offer. These actions were taken in response to Slick's request, over the opposition of its fellow all-cargo carrier, Flying Tiger Line, that the Board 'delineate the roles' of combination and all-cargo carriers[2] in such a way as to make the all-cargo carriers the 'wholesalers' and the combination carriers the 'retailers' of air cargo space. I have trouble seeing how a 'regulation' which turns identical certificates into ones which place the licensees in entirely distinct carrier roles, carrying different types of cargo for different types of shippers, can be said to be anything less than an amendment of outstanding certificates. This much is clear, for it is undisputed that after the 'regulation' Petitioners could not lawfully engage in the same carriage as their all-cargo competitors. Indeed the Board concedes that its action has excluded Petitioners from performing the kind of carriage which they were originally certificated to perform and in which they have made large investments of capital. I therefore dissent from the majority's conclusion that an adjudicatory hearing was not required. As I see it this is nothing more than a transparent device to favor some carriers at the expense of others.
 
 
 49
 The certificates of the all-cargo carriers and those of the combination carriers bestow identical rights and impose identical obligations with respect to the carriage of property. It follows that the two types of carriers must be free to file identical tariffs for the carriage of cargo. By permitting the all-cargo carriers to file blocked-space tariffs the Board acknowledges their present authority to file such tariffs under their existing certificates, which, except as to passenger carriage, are the same as those of the combination carriers. By denying the combination carriers the opportunity to file such tariffs the Board in effect amends outstanding certificate authority. Cf. FCC v. National Broadcasting Co. (KOA), 319 U.S. 239, 63 S.Ct. 1035, 87 L.Ed. 1374 (1943).
 
 
 50
 The majority opinion cites a number of cases in an effort to sustain its holding that the Board has authority to amend Petitioners' certificates by rulemaking rather than an adjudicatory procedure. Those cases are not in point. First, most of them dealt with agencies other than the CAB. The Supreme Court said recently in another context, 'federal agencies are not fungibles * * *-- Congress has treated the matter with attention to the particular statutory scheme and agency.' International Union, United Auto. Aerospace & Agriculture Implement Workers, etc. v. Scofield, 382 U.S. 205, 210, 86 S.Ct. 373, 377, 15 L.Ed.2d 272 (1965).[3] We are dealing here with a statute motivated in large part by concern for 'security of certificate.' CAB v. Delta Air Lines, 367 U.S. 316, 322 n. 6, 324-325, 81 S.Ct. 1611 (1961). This concern is reflected in the section 401(g) requirement of an evidentiary hearing before a certificate may even be amended. Second, none of the cases relied on by the majority deals with a situation like that before us, where an agency attempts by rulemaking to amend some-- but not all-- of the outstanding certificates authorizing a particular kind of service so as to deprive the licensees of a significant part of their license authority.
 
 
 51
 United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956), upon which the majority chiefly relies, as well as FPC v. Texaco, 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 122 (1964),[4] and National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943),[5] are cases dealing with rulemaking applying across the board to all applicants for licenses or certificates. Petitioners there were not being deprived of any authority they had formerly exercised; in those cases rulemaking was used to formulate reasonable, nondiscriminatory criteria to be met as conditions of receiving certificates in the first place. By contrast, the present appeal involves a use of rulemaking to abridge existing certificates to give favored carriers a monopoly on certain classes of carriage for the express purpose of 'foster(ing) their development' at the expense of others not so favored. These differences are not 'fortuitous circumstances' recognition of which leads to 'revising' or 'reshaping' the Storer doctrine, as the majority suggests. They are basic not only to the statute but also to the question of the appropriateness of rulemaking procedures, as I will show.
 
 
 52
 Air Line Pilots Ass'n, Intern. v. Quesada, 276 F.2d 892 (2d Cir. 1960), is even less apposite. That case involved the narrow issue of validity of a rule based on flight safety considerations against pilots flying scheduled aircraft after reaching age 60; there was no amendment of certificate authority in the sense here involved. The licenses originally issued to the pilots specifically provided that their duration was as set out in current regulations. And the Act itself imposes an express duty on the Administrator of the FAA to prescribe reasonable regulations relating to pilot standards. It was thus in a very narrow and limited context that the court held that an adjudicatory hearing was not required for each individual pilot; the rule laid down there was made applicable to all pilots, not to certain ones selected by the Board.
 
 
 53
 Finally, the majority relies on Capitol Airways, Inc. v. CAB, 110 U.S.App.D.C. 262, 292 F.2d 755 (1961), which expressly distinguishes cases like the one before us and includes dictum directly on point here, while distinguishing CAB v. American Air Transport, Inc., 91 U.S.App.D.C. 318, 201 F.2d 189 (1952):
 
 
 54
 American Air Transport * * * involved an effort by the Board to separate the sheep from the goats * * *. This court remanded the case to the District Court to determine whether the Board had in fact changed the terms of existing licenses. The inference to be drawn is that if the Board proposed to discriminate between carriers in the same group, characterizing some as law abiders and some as law breakers, it would be required to afford an evidentiary hearing to those whose operating authority was to be suspended or revoked for cause.
 
 
 55
 In contrast, in the present case the impact of the Board's decision is on an entire class, rather than on particular members of the class who are singled out as law violators or labeled for some reason an unfit or unworthy. Here, the Board has left all competitors in the field, but has redrawn the rules of the game. Some will be easily able to survive under these new rules: some will not. But there is no attempt to adjudicate the merits of individual firms * * *.
 
 
 56
 110 U.S.App.D.C. at 265, 292 F.2d at 758. The majority seeks to distinguish the import of this language and the American Air Transport case on the ground that here the Board does not accuse petitioners of violating the law. I confess great difficulty in understanding why licensees not accused of violating the law are not as much entitled to an adjudicatory hearing as licensees who are so accused, when the two are subjected to equivalent Board action. The majority's proposed distinction seems to me to pose substantial problems of equal protection of the laws under the fifth and fourteenth amendments.
 
 
 57
 Although it is not necessary to discuss the relative desirability of rulemaking and adjudicatory procedures in a situation where Congress has spoken as clearly as it has here, I note that my conclusion as to congressional meaning is reinforced by a consideration of the types of issues involved here. Rulemaking is normally directed toward the formulation of requirements having a general application to all members of a broadly identifiable class. As pointed out above, however, the CAB's result here is reached by a rule which has different impacts upon members of the same basic category. When the Board makes such a differentiation, the proceedings inescapably become highly adversary in character, especially where the final determination purports to rest upon asserted differences in capabilities and potentialities as between individual carriers. The rulemaking procedure's lack of direct testimony of witnesses, cross-examination, and other features of adjudicatory hearings is totally inadequate for the testing of such competing considerations, both factual and inferential.
 
 
 58
 While the question whether reducedrate 'blocked-space' service may be offered by any carrier might well be appropriate for rulemaking, the selection of particular carriers to provide such service is clearly the sort of question which can be resolved properly and fairly only in an adjudicatory proceeding. Once the Board had decided that it should not allow every freight carrier to offer such service, it was faced with the problem of picking and choosing among competing, mutually exclusive applications. Cf. Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). Furthermore, these were not applicants competing for a new right which neither had previously held; they were competing to retain a right which their certificates already authorized. The Board's action made some carriers 'more equal' than others.
 
 
 59
 The majority seems to be trying to suggest, by repeated references to the combination carriers as a 'class', that any multiple of one automatically makes a class for these purposes; two seems sufficient to make a 'class' of the only domestic all-cargo carriers now certificated. The 'formal' procedural safeguards which seem to distress the majority, see pp. 10-14, supra, were written into law by Congress precisely because Congress believed that they were necessary in making this crucial kind of determination. A general dissatisfaction with the 'rigors' of procedural safeguards should not lead to dispensing with them in a case where they are most appropriate, nor to amending the statute judicially.
 
 
 60
 While it is not essential to my view of this case, it seems to me of no little significance that the history of all transportation, air, water or land, is that the carriage of bulk freight becomes the dominant and most lucrative business. I see no reason why this is not likely to be true in air carriage.[6] Although passenger carriage is clearly a major and profitable market now, it does not follow that it has the bright prospects for expansion that are open to air freight carriage. History indicates that the future will see a steadily increasing ratio of freight tonnage to passenger tonnage. The Board action here arbitrarily permits one group of favored carriers to preempt much of this lucrative and expanding market by depriving equally certificated carriers of part of their duly granted authority. The Board's 'Policy Statements' confirm the accuracy of this forecast by declaring that the opportunity to offer reduced blocked-space rates would give the all-cargo carriers 'a needed source of financial strengthening,' while implying that the combination carriers 'can be expected' to suffer no reduction in the amount of air freight they presently carry. Even if the Board has the power to realign so drastically the competitive positions of carriers holding equal certificates, the Act as I read it requires that the Board first hold an evidentiary hearing, before it may make such a certificate amendment.
 
 
 
 *
 Circuit Judge Washington Became Senior Circuit Judge on November 10, 1965
 
 
 [1]
 Hereafter sometimes referred to as the Board, or CAB
 
 
 [2]
 Regulation No. PS-24, dated August 7, 1964, 'Statements of General Policy Blocked Space Service,' constituting Amendment 3 to Part 399 of the Board's regulations, contains statements of policy adopted by the Board for the guidance of the public, with certain exceptions. Amendment 5 added to Subpart C (Policies Relating to Rates and Tariffs) a new 399.37, now codified as 14 C.F.R. 399.37, defining blocked space as follows:
 'Blocked space service' means the carriage of property in all-cargo aircraft at wholesale rates pursuant to an effective triff stating a rate applicable only when the user reserves and agrees to pay for a specified amount of space or lift on a regularly recurring basis for a period of not less than 60 days.
 
 
 [3]
 Order No. E-21160, August 7, entered in Cocket 15419. Appellant American Airlines sought a stay of Order E-21160. At the suggestion of this court, and to enable this court to rule on that motion, the Board, by Order E-21166, August 7, 1964, stayed the effectiveness of Order E-21160 to August 17, 1964. On August 14, 1964, a division of this court issued an order staying the effectiveness of the Board's order pending hearing on the merits. On October 20, 1664, this court granted a petition for rehearing en banc of the order granting a stay, vacated the court order of August 14, 1964, and denied motion for stay. Since the maximum time for suspenstion of a tariff would in any event have expired before the hearing of this case, the order is now moot and will not be reviewed by this court
 In Order E-21160 the Board directed that the investigation into the lawfulness of the Slick tariff in Docket 15419 should proceed.
 
 
 [4]
 The Slick tariff which the Board permitted to go into effect imposed a minimum of 200 pounds for shipments. The defensive tariffs filed by petitioners as to the blocked space arrangement contained no such limitation
 
 
 [5]
 This authority exists by virtue of certificates issued under the statutory 'grandfather' provision. civil Aeronautics Act of 1938, 401(e), 52 Stat. 988
 
 
 [6]
 We use the term 'legislative findings and conclusions' to avoid confusion with the 'findings and conclusions' required by 8(b) of the Administrative Procedure Act for adjudications and rules required to be made on the record after opportunity for agency hearing
 
 
 [7]
 49 U.S.C. 1302(a) and (f), and 1303(b)
 
 
 [8]
 49 U.S.C. 1354(a)
 
 
 [9]
 Storer Broadcasting Co. v. United States, 95 U.S.App.D.C. 97, 220 F.2d 204 (1955)
 
 
 [10]
 United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956)
 
 
 [11]
 The Federal Power Commission had validly adopted a rule rpohibiting certain pricing provisions in the rate schedules of independent producers of natural gas, and had summarily rejected applications for certificates of public convenience and necessity which contained rate schedules with providions running afoul of the Commission's rule. The Court of Appeals for the Tenth Circuit held that the rule could not be applied to deprive a certificate applicant of the adjudicatory hearing guaranteed him by 7 of the Natural Gas Act. 276 F.2d at 896. The Supreme Court reversed. See generally Davis, 2 Administrative Law 15.03 (1958)
 
 
 [12]
 National Broadcasting Co. upheld the validity of regulations applicable to radio stations engaged in chain broadcasting. The regulations were issued in 1941 after an investigation and legislative hearings appropriate for rule making (see 319 U.S. at 194-195, 63 S.Ct. 997), but not the adjudicatory-type hearing prerequisite under the Communications Act, even prior to the Administrative Procedure Act, for denial of a license application or modification or non-renewal of license, see Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 332, 66 S.Ct. 148, 90 L.Ed. 108 (1945). The regulation required radio station licensees engaged in chain broadcasting to alter long-standing business practices-- e.g. precluded network affiliation contracts for a term longer than two years-- to avoid revocation or at the very least non-renewal of licenses. But the court found (319 U.S. p. 225, 63 S.Ct. p. 1013) that there was 'no basis for any claim that the Commission failed to observe procedural safeguards required by law.'
 
 
 [13]
 The court upheld the poomulgation, without adjudicatory hearings, of a Federal Aviation Agency regulation barring individuals sixty years old from serving as pilots, even though that regulation modified rights under all outstanding licenses and effected a termination without hearing of some outstanding licenses. Rejecting a challenge by pilots relying on the statutory provision, 49 U.S.C. 1371(g), that an adjudicatory hearing must be provided before an airman's license may be revoked or amended, the court stated (276 F.2d at 896):
 The Administrator's action does not lose the character of rule-making because it modifies the plaintiff pilots' claimed property rights in their licenses and their contractual rights under collective bargaining agreements * * *. Administrative regulations often limit in the public interest the use that persons may make of their property without affording each one affected an opportunity to present evidence upon the fairness of the regulation.
 
 
 [14]
 Capitol Airways upheld a CAB order amending its rules so as to require 'supplemental' air carriers serving military installations to apply for individual exemptions from restrictions on their preexistent operating authority, rather than enjoying a blanket exemption previously in effect under the Board's rules. The court held that this action could be effected without a hearing, although the Board 'has redrawn the rules of the game' in such a way that some competitors will survive while others will not. 110 U.S.App.D.C. at 265, 292 F.2d at 758
 
 
 [15]
 Section 5 of the APA in substance provides that the officers who receive the evidence shall make an initial decision, or at least a recommended decision, and prohibits any officer engaged in investigating or prosecuting functions from participating in the decision. It protects the right of cross-examination and the right of presenting oral testimony
 
 
 [16]
 Chenery recognizes that an agency may have the discretion to determine how to proceed. The objective of pursuit of the 'rule of law' in the administrative process, through devdlopment of relatively clear and informative public standards, can be achieved either through rule making or the case-by-case adjudicatory system
 For some statements reviewing the relative advantages and disadvantages of rule making procedures as opposed ot adjudication for the development of agency policy, and concluding that increased use of rule making is in the public interest, see e.g., Friendly, The Federal Administrative Agencies: The Need for Better Definition of Standards (1962); Shapiro, The Choice of Rule Making or Adjudication in the Development of Administative Policy, 78 Harv.L.Rev. 921 (1965); Baker, Policy By Rule or Ad Hoc Approach-- Which Should it Br? 22 Law & Contemp.Prob. 658 (1957).
 Judge Friendly in effect suggests (p. 105) that the case-by-case technique as utilized by the CAB has muddied the waters and operated to avoid an overall policy statement of approach to the route structure.
 
 
 [17]
 5 U.S.C. 1001(c) defines 'rule' as meaning 'any agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy.' Professor Davis points out that the words 'or particular' were inserted after Senate passage in order, said the House Commitee, to 'assure coverage of rule making addressed to named persons,' that the words were not intended to change into rule making what was previously considered adjudication but 'to make sure that what has traditionally been regarded as a rule will still be a rule even though it has particular instead of general applicability.' 7 Davis, supra note 11, 5.02
 
 
 [18]
 Landis, Report on the Regulatory Agencies to the President-Elect, p. 18 (1960)
 A leading practitioner before the CAB had even suggested that the breakdown of the administrative process in protracted cases should be overcome by the adoption of a conference-hearing procedure, with virtual elimination of oral testimony, including cross-examination, and hearings confined in substance to conference discussions between lawyers and expert witnesses. Westwood, Administrative Proceedings: Techniques of Presiding, 50 A.B.A.J. 659 (1964).
 
 
 [19]
 See Attorney General's Manual on the Administrative Procedure Act, p. 15 (1947)
 
 
 [20]
 Capitol Airways, Inc. v. CAB, 110 U.S. App.D.C. 262, 265, 292 F.2d 755, 758 (1961). What Judge Washington had in mind was the use of rules as a guise for imposition of sanctions on some parties for violations of the Act, not the kind of distinctions made by the Board here
 
 
 [21]
 Compare pp. 107-08 of the Final Report of the Attorney General's Committee on Administrative Procedure (S.Coc. 8, 77th Cong., 1st Sess.) (1941):
 (Hearings) are now generally held in connection with the fixing of prices and wages, the prescription of rules for the construction of vessels and other instruments of transportation, the regulation of the ingredients and physical properties of food, the prescription of commodity standards, and the regulation of competitive practices. The regulation of all of these matters bears upon economic enterprise and touches directly the financial aspects of great numbers of businesses affected, either by imposing direct costs or by limiting opportunities for gain. Appreciation fo these effects, both by businessmen and government officials, seems to be the chief cause of the increased use of hearings in administrative rule making.
 The Committee believes that the practice of holding public hearings in the formulation of rules of the character mentioned above should be continued and established as standare administrative practice, to be extended as circumstances warrant into new areas of rule making. The difficulty of defining necessary exemptions from any general prescription argues strongly, however, against the wisdom or feasibility of a statutory requirement that hearings invariably precede promulgation of a regulation. * * * Here, as elsewhere in the administrative process, ultimate reliance must be upon administrative good faith-- good faith in not dispensing with hearings when controversial additions to or changes in rules are contemplated.
 
 
 [22]
 Compare S.Rep.No. 752, 79th Cong., 1st Sess. p. 18 (1945); Administrative Procedure Act, Legislative History, p. 204 (S.Doc. No. 248). The Senate Judiciary Committee, while according to initial licensing certain exceptions from procedural requirements generally applicable to adjudicatory determination 'upon the theory that in most licensing ceses the original application may be very much like rule making,' observed that some cases 'tend to be accusatory in form and involve sharply controverted factual issues. Agencies should not apply the exceptions in such cases, because they are not to be interpreted as precluding fair procedure where it is required.'
 
 
 [23]
 Opportunity for oral argument to the board is not necessarily requisite even in anjudicatory proceedings, NLRB v. Clausen, 188 F.2d 439 (3rd Cir.), cert. denied, 342 U.S. 868, 72 S.Ct. 108, 96 L.Ed. 653 (1951). Whether it is required by due process depends upon the circumstances. FCC v. WJR, The Coodwill Station, 337 U.S. 265, 276, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949)
 
 
 [24]
 A request for cross-examination is generally of less value when not coupled with a proffer of direct proof, see Westwood, supra note 18
 Petitioner United Stated in its comments that 'if the Board accepts the conclusions of its staff predicated as they are on inaccurate and untested cost estimates, the combination carriers will be penalized and their right to operate allcargo aircraft somehow impaired.' Disputes as to costs frequently involve judgment as to cost allocations, and in such matters, as Justice Brandeis noted long ago, 'experience teaches us that it is much easier to reject formulas presented as being misleading than to find one apparently adequate.' Groesbeck v. Duluth, S.S. & A.R. Co., 250 U.S. 607, 614-615, 40 S.Ct. 38, 41, 63 L.Ed. 1167 (1919).
 
 
 [25]
 See 1 Davis, Administrative Law 7.02, p. 413 (1958):
 Adjudicative facts usually answer the questions of who did what, where, when, how, why, with what motive or intent; adjudicative facts are roughly the kind of facts that go to a jury in a jury case. Legislative facts do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion.
 
 
 [26]
 Thus the Board noted its conclusion that expansion to combination carriers was not feasible 'at this time.' In the accompanying order permitting Slick's tariff to go into effect, the Board stated: 'We believe that Slick is proposing a worth-while experiment which should be tested in the market place. * * * Permitting Slick's tariff to go into effect now will also provide the Board with experience data upon which we may better gauge the effect of the blocked space service during the course of the ensuing investigation.' Order No. E-21160, August 7, 1964
 
 
 [27]
 See National Broadcasting Co. v. United States, 319 U.S. 190, 225, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); United States v. Storer Broadcasting Co., 351 U.S. 192, 205, 76 S.Ct. 763, 100 L.Ed. 1081 (1956)
 
 
 [1]
 Federal Aviation Act of 1958, 401(g), 72 Stat. 756, 49 U.S.C. 1371(g) (1964); see C.A.B. v. Delta Air Lines, 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869 (1961)
 
 
 [2]
 The Board purported to find authority for this delineation in section 416(a) of the Act, 72 Stat. 771, 49 U.S.C. 1386(a) (1964), which provides:
 The Board may from time to time establish such just and reasonable classifications or groups of air carriers for the purposes of this title as the nature of the services performed by such air carriers shall require; and such just and reasonable rules and regulations, pursuant to and consistent with the provisions of this title, to be observed by each such class or group, as the Board finds necessary in the public interest.
 The Board's 'Policy Statements,' described in the majority's footnote 2, asserted the following justification for its action:
 A logical means of further delineating the role of the all-cargo carriers is to foster their development as specialists for large volume air freight service in all-cargo aircraft. The reservation of blocked space arrangements exclusively to the all-cargo carriers is consistent with this objective. The increased concentration of the all-cargo carriers on large volume traffic can be expected to be followed by a shift of small volume shipments to the combination carriers, whose cargo operations supplement their passenger services and who are better suited for meeting the needs of this category of traffic and at less cost.
 In light of this statement, it should be remembered that the all-cargo airlines carry about 15 per cent of the nation's scheduled domestic airfreight, while the combination carriers carry 85 per cent. Of such freight transported in all-cargo airplanes, the all-cargo lines carry 36 per cent, and the combination lines 64 per cent.
 
 
 [3]
 This distinction is particularly applicable to Transcontinent Television Corp. v. FCC, 113 U.S.App.D.C. 384, 308 F.2d 339 (1962), cited by the majority, which dealt with the very different legislative situation of broadcast station license renewals under the Communications Act of 1934, which gives the FCC broad powers to make frequencies unavailable by rule amendment
 
 
 [4]
 See generally 39 N.Y.U.L.Rev. 347 (1964)
 
 
 [5]
 It is relevant to note that the opinion in National Broadcasting Co. does not mention the issue before us
 
 
 [6]
 As the majority itself recognizes, the fact that experience since the order became effective shows 'no significant diversion' of cargo from petitioners is a makeweight argument lacking in probative value. Moreover, such off-the-record argument is not properly before us